**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| JASON CAP, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CARMAX, INC., WILLIAM D. NASH, and ENRIQUE N. MAYOR-MORA,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Jason Cap ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding CarMax, Inc. ("CarMax", or the "Company"), and information readily

1

obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded CarMax securities between June 20, 2025 and September 24, 2025, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act"). [1]

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

---

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted.

**PARTIES**

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased CarMax securities during the Class Period and was economically damaged thereby.

7. Defendant CarMax's principal executive offices are located in Richmond, Virginia. CarMax has multiple locations in this judicial district. The Company's common stock trades on the New York Stock Market (the "NYSE") under the ticker symbol "KMX

8. Defendant CarMax sells used cars. It describes itself as the "nation's largest retailer of used vehicles."

9. Defendant William D. Nash ("Nash") served as the Company's Chief Executive Officer ("CEO"), President, and Director at all relevant times.

10. Defendant Enrique N. Mayor-Mora served as the Company's Chief Financial Officer ("CFO") and Executive Vice President at all relevant times.

11. Defendants are collectively referred to herein as the "Individual Defendants."

12. Each of the Individual Defendants:

    (a) directly participated in the management of the Company;

    (b) was directly involved in the day-to-day operations of the Company at the highest levels;

    (c) was privy to confidential proprietary information concerning the Company and its business and operations;

    (d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

13. CarMax is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15. CarMax and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading Statements Issued During the Class Period

16. On June 20, 2025, CarMax issued a press release entitled "CarMax Reports First Quarter Fiscal Year 2026 Results." (the "Q1 Release").

17. The Q1 Release highlighted a slew of positive results, including increased net earnings per diluted share, increased sales, and increased gross profit.

18. The Q1 Release quoted Defendant Nash as stating the following:

We delivered our fourth consecutive quarter of positive retail comps and double-digit year-over-year earnings per share growth. ***These results highlight the strength of our earnings growth model, which is underpinned by our best-in-class omni channel experience, the diversity of our business, and our sharp focus on execution***. Our associates, stores, technology and digital capabilities, all seamlessly tied together, enable us to provide the most customer-centric car buying and selling experience. ***This is a key differentiator in a***

4

*very large and fragmented market that positions us to continue to drive sales, gain market share, and deliver significant year-over-year earnings growth for years to come*.

19.     The statement in ¶ 18 was materially false and misleading at the time it was made because Defendant Nash recklessly overstated CarMax's prospects. In reality, Defendants were in no position to assure that there would be positive results for "years to come." In fact, as Defendants knew or should have known, CarMax's Q1 results were positive because of consumer speculation about tariffs (which motivated many to buy cars), and not a sign that CarMax's business was positioned to deliver "significant year-over-year earnings growth for years to come."

20.     On the same day, CarMax held its earnings call for the first quarter of the 2026 fiscal year (the "Q1 2026 Call").

21.     The Q1 2026 Call included the following exchange between Defendants Nash, Mayor Mora, and an analyst:

> **Brian William Nagel - Analyst**: Nice quarter, congratulations. *I guess the question I want to ask, we've seen a nice acceleration here in your used car business*. I know you don't typically talk much about intra-quarter trends or trends into the following quarter. *But the question I ask is, I mean, how are you viewing the sustainability here?* I mean as you're looking at this, is the business coming back? Is there anything unique to this reacceleration?
>
> **Defendant Nash**: Sure[.] I'll take the first one, and then Enrique, do you want to talk about the expenses. As far as acceleration, look, Brian, we feel really good. I mean, first of all, just back up a second. We're really pleased that this is the fourth consecutive quarter of comp growth. Obviously, this quarter, we're pleased with the comps, especially all 3 months were positive. As I think about the acceleration, and we talked a little bit about this last quarter, I think this month -- *this quarter's performance, it's driven some by the macro factors, but I also think it's driven some by with what we have can control*.
>
> And I would go back to some remarks I made in the last quarterly call, *which is the quarter started off strong and then we saw an uptick at the end of the quarter when there was speculation about the tariffs. And then I talked about that uptick towards the latter part of March and then rolling into April, we saw another little uptick. And so April ended up being the strongest month for us.*
>
> *But I would just go back to even before we saw that the initial uptick, the business was growing -- was doing well. And I think that's a reflection of a lot of the work that we've done internally, whether it's the inventory management, it's our pricing, it is our savings,*

5

*it's the omnichannel experience, continuing to make that better*. So I think there's -- this performance is both part market driven. I think it's also driven by us. So we feel great about the rest of the year. As I said at the end of last year that we would expect to grow sales and gain share this year, and there's nothing that's changed that outlook. Enrique?

**Defendant Mayor-Mora**: Yes. For SG&A, Brian, we spent the past couple of years being able to lever SG&A, and that's really given all the actions we've taken on focusing on efficiency. And we're committed to continuing to lever the business. I do think this quarter is really illustrative of the power of the model that we've built. So strong comps, and we levered SG&A almost 700 basis points this quarter.

And when you look at the increase in SG&A for this quarter, primarily, it was driven by variable costs. But again, with those variable costs, we were able to lever again by almost 700 basis points, taking us to the mid-70% in the first quarter here. So we're committed to continue doing that, and you can see the power of the model here.

**Nash**: Yes. And Brian, the only thing I would add to that is that's a big focus for us is continuing that leverage. And we certainly like the additional volume and how it helps that, but we're also very much focused on continuing to find efficiencies, continuing to take SG&A. And we just think there's a lot of opportunities still there.

22. The statements contained in ¶¶ 18 and 21 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants recklessly overstated CarMax's growth prospects when, in reality, its earlier growth in the 2026 fiscal year was a temporary benefit from customers buying cars due to speculation regarding tariffs; and (2) as a result, Defendants' statements about CarMax's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

23. On September 25, 2025, before market hours, CarMax issued a press release entitled "CarMax Reports Second Quarter Fiscal Year 2026 Results." (the "Q2 Release"). In the Q2 Release, CarMax announced results including the following:

6

- Retail unit sales decreased 5.4% and comparable store unit sales decreased 6.3%; wholesale units decreased 2.2%;

- *Net earnings per diluted share of $0.64 versus $0.85 a year ago*;

24. The Q2 Release quoted Defendant Nash as acknowledging that Q2 was a "challenging quarter."

25. On the accompanying earnings call (the "Q2 Call"), Defendant Nash acknowledged the following:

> During our first quarter call, *I mentioned that we saw an uptick in sales volume in March and April due to the tariff speculation*. This impacted our performance in the second quarter in 2 ways. First, we ramped our inventory ahead of the second quarter to support this growth. *Across the back half of May through the end of June, we saw about $1,000 in depreciation, which natively impacted our price competitiveness and our sales*.

26. On this news, CarMax's stock price fell $11.5 per share, or 20.07%, to close at $45.60 per share on September 25, 2025. The next day it fell a further 1.62%, to close at $44.86.

27. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

28. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired CarMax securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

7

29. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

30. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

32. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

33. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

34. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

35. Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

36. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

37. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

38. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

39. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

40. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

41. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

42. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

43. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

44. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

45. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

46. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

47. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

48. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices

49.     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

50.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

51.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 3, 2025

**THE ROSEN LAW FIRM, P.A.**
/s/ Phillip Kim
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

**THE SCHALL LAW FIRM**
Brian Schall (Pro hac vice application forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Phone: (310) 301-3335
Fax: (877) 590-0483
Email: brian@schallfirm.com

*Additional Counsel for Plaintiff*