UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

NORTHERN DIVISION

| | | |
|---|---|---|
| JASON CAP, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:25-cv-03602-JKB |
| Plaintiff, | ) ) ) | LEAD PLAINTIFF'S COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | ) ) | |
| CARMAX, INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ....................................................................................................... 1

II.   JURISDICTION ........................................................................................................ 4

III.  PARTIES .................................................................................................................... 5

IV.   OVERVIEW OF DEFENDANTS' FRAUD ............................................................. 8

      A.    Background of CarMax's Business ............................................................... 8

      B.    CarMax's Pre-Class Period Initiatives to Grow Market Share and Profits
            in Retail and CAF ......................................................................................... 9

      C.    Defendants Concealed Massive Loan Losses Stemming from CarMax's
            Expansion into Subprime Lending ............................................................... 13

      D.    Defendants Finally Reveal Massive Losses Within CarMax's CAF
            Portfolio Requiring Significant Loan Loss Provisions and Terminate CEO
            Nash Due to the Company's Poor Financials and Declining Business
            Outlook ......................................................................................................... 19

      E.    Post-Class Period Events ............................................................................. 22

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
      AND OMISSIONS ................................................................................................... 23

      A.    1Q26 Materially Misleading Statements and Omissions .............................. 23

      B.    2Q26 Materially Misleading Statements and Omissions .............................. 30

      C.    Defendants' Class Period Statements Violated GAAP ................................. 32

            1.    GAAP Requirements ........................................................................ 33

            2.    2022 and 2023 Loan Vintages .......................................................... 36

            3.    Defendants' Under Provisioning was Material ................................. 42

VI.   LOSS CAUSATION AND ECONOMIC LOSS ...................................................... 43

VII.  PRESUMPTION OF RELIANCE ........................................................................... 50

VIII. NO SAFE HARBOR ............................................................................................... 52

IX.   CLASS ACTION ALLEGATIONS ......................................................................... 53

**Page**

COUNT I ................................................................................................................55

    Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
        Thereunder Against All Defendants ....................................................................55

COUNT II ..............................................................................................................59

    Violations of Section 20(a) of the Exchange Act Against All Defendants........................59

PRAYER FOR RELIEF ........................................................................................60

JURY TRIAL DEMANDED...................................................................................61

Lead Plaintiff, the Excavators Union Local 731 Pension Fund and the City of Birmingham Retirement and Relief System ("Lead Plaintiff"), on behalf of itself and all others similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's complaint against Defendants, allege the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of certain United States Securities and Exchange Commission ("SEC") filings by CarMax, Inc. ("CarMax" or "Company"), Company press releases and earning calls, court filings in related litigation, analyst and media reports about the Company, price and volume data for CarMax securities, and other publicly available materials and data. Many of the facts supporting the allegations are known only to the Defendants named herein, or are exclusively within their custody and control. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This securities class action is brought on behalf of all persons and entities who or which purchased or otherwise acquired CarMax publicly traded securities between June 20, 2025 and November 5, 2025, inclusive (the "Class Period"). The claims asserted herein are alleged against CarMax, William D. Nash ("Nash"), Enrique N. Mayor-Mora ("Mayor-Mora"), and Jon G. Daniels ("Daniels") (collectively, "Defendants") and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. This complaint alleges that, throughout the Class Period, Defendants misled investors by failing to disclose that: (1) CarMax's CarMax Auto Finance ("CAF") segment's first quarter 2026 ("1Q26") loan loss provisions were inadequate to cover the losses from, among other

things, CarMax's underperforming 2022 and 2023 vintage loans; (2) CarMax had an inventory oversupply, coupled with depressed sales prices and declining sales of vehicles at its retail lots in the first quarter of 2026 ("1Q26"); (3) this oversupply caused substantial depreciation in the value of CarMax's inventory; (4) CarMax's mid-2025 sales boost was largely driven by customers rushing to purchase used cars amid macroeconomic concerns, and not due to CarMax's unique operational offerings; and (5) based on the foregoing, Defendants materially understated loan loss provisions, and overstated earnings while misleading investors about the Company's business, operations, and growth prospects.

3.      For example, at the start of the Class Period, Defendants reported a *$102 million loan loss provision* for 1Q26 and assured the market that they had "*appropriately reserved and adjusted*" for increased loan loss provisioning stemming from underperforming 2022 and 2023 CAF loans, and the loan loss provision was at its "high watermark" in 1Q26.  Defendants further touted the Company's internal "new underwriting models and corresponding tests currently in place" and stated that "[we] will carefully monitor the consumer behavior and the broader economy and *will adjust our [CAF portfolio] origination strategy as needed*."   Defendants also characterized the "uptick" in used car sales during 1Q26 as "*a reflection of a lot of the work that we've done internally, whether it's the inventory management, it's our pricing, it is our savings, it's the omni channel experience, continuing to make that better*" and minimized the impact from macroeconomic factors, like tariff "speculation" or student loan repayments.  These and other similar statements caused CarMax securities to trade at artificially inflated prices during the Class Period.

4.      Unbeknownst to investors, the statements described above were false and misleading, and omitted material information because CarMax's loan loss provisioning in 1Q26

was inadequate to cover the known or severely recklessly disregarded loan losses stemming from, among other things, poorly performing 2022 and 2023 vintage loans.  CAF's Executive Vice President ("EVP") Daniels later admitted during the second quarter of 2026 ("2Q26") that "we watched [2022 and 2023 vintage borrowers] begin to struggle and continue to struggle a little bit" and "we saw some of those customers coming back into delinquency and loss *during* Q1." Defendants further admitted that they were aware *in* 1Q26 that the Company contributed to an overstock of cars which caused drastic price and sales declines.  Defendants explained that CarMax had "ramped up [its] inventory *ahead of* the second quarter," and the Company was now taking measures to reduce inventory to correct this overstock, with Defendants admitting that "[a]cross the back half of May [*i.e.* during 1Q26], through the end of June we saw about $1,000 [per car] in depreciation, which negatively impacted our price competitiveness and our sales."  By the end of the Class Period, Defendants further acknowledged that CarMax's 1Q26 positive earnings growth was actually driven by macroeconomic factors, which motivated car purchases rather than reflecting increased demand generated by CarMax's underlying business initiatives, as Defendants previously touted, and surprised investors with preliminary continued sharp declines in retail sales for the third quarter of 2026 ("3Q26").

5.       The truth emerged through two corrective disclosures.  First, on September 25, 2025, CarMax reported disastrous 2Q26 financial results caused, in large part, by a $142 million increase in loan loss provisioning for 2Q26, resulting in a 27% decrease in CAF income from the prior quarter.  Defendants disclosed that $71 million of the increase in provisioning was primarily related to 2022 and 2023 vintage loans.  CarMax further cited macro-economic related pull-forward of demand and inventory purchases in 1Q26 that left the Company with excess inventory and depressed car prices beginning in May 2025.  On this news, CarMax's stock price fell 20.1%.

Then, on November 6, 2025, CarMax shocked investors when it disclosed that it had terminated the employment of longtime CarMax executive and Chief Executive Officer ("CEO") Nash and reported poor preliminary 3Q26 outlook, including a sharp decrease in used-car sales in the current quarter. On this news, CarMax's stock price plummeted an additional 24.3%.

6. As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of CarMax's securities, Lead Plaintiff and the Class (defined herein) suffered significant losses and damages under the federal securities laws.

## II. JURISDICTION

7. The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 27 of the Exchange Act, because CarMax conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District. In its Form 10-K for the fiscal year ended February 28, 2025, filed with the SEC on April 11, 2025 ("FY25 Form 10-K"), the Company states that "[s]ince a large portion of our sales [are] generated in . . . Washington, D.C./Baltimore, our results of operations depend substantially on general economic conditions and consumer spending habits in these markets."

10. In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

- 4 -

III.    PARTIES

11.    Lead Plaintiff Excavators Union Local 731 Pension Fund is a defined benefit plan that purchased or otherwise acquired publicly traded securities of CarMax during the Class Period and has been damaged thereby, as set forth in the certification filed with the Court on January 2, 2026.  ECF 10-7.

12.    Lead Plaintiff City of Birmingham Retirement and Relief System is a pension fund that purchased or otherwise acquired publicly traded securities of CarMax during the Class Period and has been damaged thereby, as set forth in the certification filed with the Court on January 2, 2026.  ECF 10-7.

13.    Defendant CarMax's principal executive offices are located in Richmond, Virginia. CarMax has multiple locations in this judicial district.  The Company's common stock trades on the New York Stock Exchange market ("NYSE") under the ticker symbol "KMX."

14.    Defendant William D. Nash was the Company's CEO, President, and Director at all relevant times.  Nash joined CarMax in 1997 as an auction manager and in 2007 was promoted to Vice President ("VP") and later Senior VP of Merchandising.  In 2011, he was named Sr. President of Human Resources and Administrative Services and then in 2012 was promoted to EVP of Human Resources and Administrative Services.  In February 2016, he was promoted to President and in September 2016 was promoted to CEO, a member of the Board of Directors, and the Company's Chief Operating Decision Maker ("CODM").  According to the Company's 1Q26 and 2Q26 Forms 10-Q, as CODM, Nash "review[ed] CAF income to assess CAF's performance and make operating decisions, including resource allocations," "review[ed] the performance of our CarMax Sales Operations segment at the gross profit level" and "use[d] gross profit to assess financial performance, monitor forecasted versus actual results and adjust pricing strategy."  Nash served in his roles from 2016 until November 6, 2025, when the Company announced that Nash

- 5 -

was abruptly "terminated" as CEO, President, and resigned as a member of the Board, "effective as of December 1, 2025." As detailed below, Nash appeared on quarterly conference calls with Mayor-Mora and Daniels, who are also named as Defendants herein, where he made materially misleading statements and omissions to investors. Nash also signed the Company's FY25 Form 10-K and 1Q26 Form 10-Q and the respective certifications required by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") included therein.

15. Defendant Enrique N. Mayor-Mora is, and was at all relevant times, the Company's Chief Financial Officer ("CFO") and EVP. Mayor-Mora is "responsible for leading the financial planning, accounting, treasury, internal audit, investor relations, tax, real estate, procurement, and facilities functions for CarMax." According to the Company, Mayor-Mora was "instrumental in driving CarMax's capital allocation strategy, which helped transform the company from a traditional retailer to a leading omnichannel and e-commerce organization through investments in building internal capability as well as through strategic investments and acquisitions." Prior to joining CarMax in 2011, Mayor-Mora served in executive finance roles at Denny's Corporation and Gap, Inc. Mayor-Mora received his MBA from Richard Ivey School of Business at Western University and his Bachelor of Arts in economics from McGill University. As detailed below, as the Company's CFO, Mayor-Mora appeared on quarterly conference calls with Nash and Daniels, who are also named as Defendants herein, where he made materially misleading statements and omissions to investors. Mayor-Mora signed the Company's FY25 Form 10-K and 1Q26 Form 10-Q and the Sarbanes-Oxley certifications included therein.

16. Defendant Jon G. Daniels is, and was at all relevant times, the Company's EVP of CAF. As EVP of CAF, Daniels is "responsible for all strategic and managerial aspects of the financial experience at CarMax, including the approximately $18 billion capital finance company

as well as business relationships with all lending and ancillary product partners."  According to the Company, "Daniels leads CAF's strategy to become a full spectrum lender, expanding CAF's ability to reach a broader set of CarMax customers."  Daniels joined CarMax in 2008 as the VP of Risks and Analytics, and in 2014 was promoted to Senior VP of CAF.  Daniels has a Master of Science in operations from the University of Kentucky and a Bachelor of Arts in mathematics from Flagler College.  As detailed below, as the EVP of CAF, Daniels appeared on quarterly conference calls with Nash and Mayor-Mora, who are also named as Defendants herein, wherein he made materially misleading statements and omissions to investors.

17.    Nash, Mayor-Mora, and Daniels are collectively referred to as the "Individual Defendants."

18.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, products, and present and future business prospects during the time of their employment with the Company. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the misleading statements and information alleged herein, were aware of, or severely recklessly disregarded, the misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.  Finally, each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance (*e.g.*, Company press releases and SEC filings), participated in conference calls with investors during which misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## IV.    OVERVIEW OF DEFENDANTS' FRAUD

### A.    Background of CarMax's Business

19.    Incorporated in 1996, CarMax operates two reportable segments: (i) CarMax Sales Operations, which includes retail used vehicle sales, wholesale auctions, extended protection plans, and service operations; and (ii) CAF, which originates used-car loans for CarMax customers in accordance with underwriting standards established by management.  CarMax markets itself as the nation's largest retailer of used cars and one of the nation's largest providers of used vehicle financing, selling 789,050 used vehicles at retail during the fiscal year ended February 28, 2025 ("FY25")[1] and servicing about 1.1 million customer accounts within its $17.59 billion CAF portfolio of managed receivables.

20.    CarMax acknowledges that it operates in a "highly competitive" industry. According to the Company, the "U.S. used car marketplace is highly fragmented and we face competition from franchised dealers, who sell both new and used vehicles; online and mobile sales platforms; independent used car dealers; and private parties."  As a result, CarMax claims to provide "an unrivaled customer experience by offering a broad selection of quality used vehicles and related products and services at competitive, no-haggle prices using a customer-friendly sales process."  Of importance, CarMax touts its omnichannel platform which gives its "associates, stores, technology and digital capabilities seamlessly tied together" as "empower[ing] our retail customers to buy a car on their terms – online, in-store or a seamless combination of both."  CarMax asserts that its omnichannel platform is the "key differentiator" in obtaining "access to the largest total addressable market in the used car space."  And according to CarMax, "[t]his

---

[1]    CarMax's fiscal year does not follow the calendar year but begins on March 1.

positions us to deliver strong market share growth and significant year-over-year earnings growth for years to come."

21.    According to the Company's website, "CAF is one of the top lenders in the used auto space, originating nearly $9 billion annually."  CAF's primary competitors are banks and credit unions that offer direct financing to customers purchasing used cars. The Company refers to CAF as a "competitive advantage" for the Company, and explains that its primary drivers for growth "are the growth in CarMax's retail used unit sales as well as increased penetration through full credit spectrum lending."  Through CAF, CarMax is able to manage its "reliance on third-party finance providers and to leverage knowledge of our business to provide qualifying customers a competitive financing option."  CAF operates "proprietary scoring models" that rely on "the credit history and other credit data" of its customers, in addition to CAF's "historical experience to predict the likelihood of customer repayment."

**B.    CarMax's Pre-Class Period Initiatives to Grow Market Share and Profits in Retail and CAF**

22.    As a result of COVID-19, and in response to increased competition from competitors such as Carvana, which allowed customers to make purchases online, CarMax made significant investments to its omnichannel platform in an effort to improve the car-buying experience for its customers, beyond its brick-and-mortar storefronts.  Prior to the start of the Class Period, during the Company's 4Q25 conference call, Mayor-Mora commented that the Company had spent "the past several years" in a "heavy investment phase," in part, by "investing in [its] omnichannel capabilities" and "efficiencies."  Pointing to these investments, Mayor-Mora further highlighted that the Company's omnichannel platform "*is* [what has] enabled . . . strong margins, strong growth and other GPU as well, exceeding retail units."  Also during the 4Q25 conference

call, Mayor-Mora touted CarMax as "an omnichannel retailer," stating that CarMax built a "big competitive moat" that was "hard to replicate."

23.    Central to maintaining a competitive edge and strong retail profits Defendants also need to ensure the Company could properly manage inventory, as improper inventory management could negatively affect vehicle pricing and profits.  For example, in its FY25 Form 10-K, CarMax highlighted its proprietary "centralized inventory management and pricing system" as affording CarMax with "pricing discipline" and reducing the risk of vehicle depreciation.  An oversupply of vehicles could result in a decline in the inventory's worth, or vehicle depreciation, which in turn could cause CarMax to sell its vehicles at unfavorable prices in order to move inventory.  For example, during the Company's 4Q25 conference call, Nash commented on the Company's inventory management, stating: "we manage inventory better than anybody in the business.  We've been doing it for over 30 years.  We are very familiar with operating and changing a fluid type of environment."

24.    Due in part to high costs associated with the Company's investments in its growth initiatives, Defendants also took affirmative action to remain competitive and increase demand by expanding CAF's customer base by pushing further into subprime lending.  Before the Class Period, the Company abandoned its traditionally conservative CAF loan profile to take on riskier loans in an effort to increase earnings.  As of March 2021, the Company held approximately 5% of Tier 3 (subprime) loans extended to CarMax's used-car purchasers, and doubled its subprime loan target to 10%.  However, in early 2023, the Company claimed that it was tightening its credit standards.  As of February 29, 2024, CarMax reported an allowance for loan losses of approximately $483 million, reflecting its estimate of expected future credit losses.  The vast

majority – 42% – 43% of CAF's portfolio was Tier 1 loans and included customers with qualifying credit scores that borrowed directly from CAF.

25.     During the Company's April 11, 2024 conference call, however, Daniels explained that CarMax was planning to *reverse course* and increase penetration into riskier loans, stating "CAF is building the capability to scale its participation across *all* credit tiers, which will help to capture finance economics, drive sales and fully complement our valued lending partnerships that are a key foundation of CarMax's best-in-class credit platform."

26.     Starting in August 2024 (during the second quarter of 2025 ("2Q25")), CarMax launched its CAF "full spectrum" credit initiative.  With implementation of the full spectrum model, Defendants sought to increase penetration into riskier Tier 2 and Tier 3 loans, which catered to borrowers with lower credit scores – and higher risks of default.  By expanding its Tier 2 and Tier 3 penetration, Defendants claimed they could grow CarMax's business, and in turn increase market share, while at the same time mitigating risk through a non-prime asset-backed securities ("ABS") program that previously launched.  At that time, Tier 2 and Tier 3 loans accounted for only 26% of CAF's volume.

27.     Defendants discussed the full spectrum model in the third quarter of 2025 ("3Q25"), with Daniels stating on December 19, 2024:

> Regarding our full spectrum lending initiative, during Q3, we continued to test our new credit scoring models and corresponding strategies across the entirety of both the Tier 1 and Tier 2 spaces.  And in November, we began initial testing of our new Tier 3 model. During the quarter, we also successfully executed our second higher prime ABS deal.  In the next several quarters, we will remain disciplined in our testing plan, but we are excited for the significant growth opportunity that lies ahead for CAF.

28.     In June 2024, a year before the start of the Class Period, Defendants "successfully" executed CarMax's first "non-prime ABS transaction," which was followed in July 2024 by a "higher prime ABS deal." Daniels highlighted that "[t]he success of these transactions reaffirms

- 11 -

our belief that these complementary programs will provide significant additional funding capacity to support CarMax growth, while giving us the flexibility to capture a larger piece of the Tier 2 and Tier 3 landscape." Defendants often discussed how the combination of the full spectrum imitative and ABS program would allow for growth but mitigate risk. By expanding nonprime (also referred to as "subprime" by securities analysts) lending, Defendants' actions to grow market share were resulting in a riskier and deteriorating portfolio of loans that put in jeopardy CAF's financial growth and the Company's overall business outlook. Defendants were fully aware that the risks they warned of had already materialized as they pushed farther into subprime lending.

29.     Because CAF's third-party lenders (*i.e.*, Citibank, Bank of America, Capital One, Exeter, and Ally) were experiencing high numbers of delinquencies, CarMax was required to buy back loans in bulk, bringing those loans into the CAF portfolio. In doing so, the Company was taking a loan from a third party financial institution and taking ownership of the loan after the borrower had already defaulted. This program was internally referred to, informally, as the "Buy Back" or "Re-Assignment" program. These buy-back requests were received on a quarterly basis, ranging from 400-900 loans company-wide. In order to bring customers back to current on their loan status, and no longer in default, CAF employees would enter the loan information into the Alfa Systems software platform, which managed CAF's core business processes, that calculated any interest updates, past-due amounts and the write-off amount for the loan at issue. Often these were older loans that, on average, were $1,000-$1,500 in arrears, or loans with balances that averaged $12,000 to $15,000. After the write-off, the loans would be classified internally at CAF as a new loan with a new account number, with the borrower effectively starting from scratch. And because these customers were already months behind in payment at the time of the buy-back,

it was clear these loans would be delinquent once again after they were re-assigned because the customer had a demonstrated history of non-payment.

### C. Defendants Concealed Massive Loan Losses Stemming from CarMax's Expansion into Subprime Lending

30.     Just prior to the start of the Class Period, the automotive retail market was also being shaped, in part, by significant macroeconomic pressure on consumers.  Starting in January of 2025, and again in April 2025, potential tariffs were announced on imported vehicles.  Analysts observed that tariff speculation could drive customer preferences from new to used vehicles.  For example, on April 1, 2025, J.P. Morgan noted "transitory demand tailwinds due to consumer substitution from new to used cars (due to tariffs)."  A June 17, 2025 BNP Paribas report linked the Company's expansion into subprime as a means to combat these increasing pressures, stating, "KMX is further expanding into subprime as macro-economic conditions deteriorate."

31.     Additionally, just prior to the start of the Class Period, on May 9, 2025, the Company announced the departure of its EVP and Chief Growth Officer Jim Lyski ("Lyski") effective June 8, 2025.  Although a reason for Lyski's departure was not given publicly, analysts raised concerns over the change, and the impact on the Company's growth strategy to regain market share.  For example, BNP Paribas analysts commented, in the same June 17, 2025 report, that the departure sounded like "he was terminated, given that he was provided a 1-month notice period and eligibility for severance," and stated "we are looking for a better understanding of why CarMax made the change and why now."  Further, a June 16, 2025 J.P. Morgan analyst report commented that the recent departure of Lyski "suggests an acknowledgment" that the Company's omnichannel investments "haven't delivered the desired results."

32.     As the credit spectrum model broadened, CarMax's provisioning continued to dramatically increase, and at the start of the Class Period Defendants became desperate to preserve

- 13 -

earnings.[2]  To temper the increases in CarMax's loan loss provisioning, which would further negatively impact the Company's CAF financial metrics in 1Q26, Defendants launched a securitization of *only* nonprime pools of loans for sale with the sole purpose to "remove[] the requirements to reserve for future losses" and remove the "financial impact . . . due to future deterioration."  More specifically, Defendants earmarked $632 million in nonprime loans within its CAF portfolio, which it reclassified from "held for investment" to "held for sale."  This earnings management tool allowed CarMax to recognize a reduction in the loan loss provision of $26 million in 1Q26 and avoid the requirement to reserve for future losses.

33.    Analysts and the market took notice of CarMax's expansion into new initiatives and subprime lending to increase demand, but were unaware of the negative ramifications the inadequate loan loss provisions would ultimately have on the Company's consolidated earnings before income taxes and CAF income.  Taking market commentary and macro-economic conditions into account, investors were reasonably concerned about the Company's outlook at the start of the Class Period.  In direct response to these concerns,  on June 20, 2025, the first day of the Class Period, Defendants shifted the tone and emphasized to investors "the strength of our earnings growth model, which is underpinned by our best-in-class omnichannel experience, diversity of our business, and a sharp focus on execution" as a "key differentiator in a very large and fragmented market and positions us to continue to drive sales, gain market share and deliver

---

[2]    As detailed more fully below in §V.C., under applicable accounting rules, CarMax was required to establish a reserve for loan losses on its massive loan portfolio and periodically adjust this liability to reflect changes in customer credit risk and loan performance.  CarMax was required to account for estimated loan losses by recording a loan loss provision each fiscal quarter.  The loan loss provision is calculated and recorded at the time the loan was originated for the losses estimated for the entire life of the loan.  CarMax also was required under applicable accounting rules to make any necessary adjustments to the loss provision for increased credit risk, no matter how remote the risk was.

significant year-over-year earnings growth for years to come." Moreover, Nash touted that the Company had taken action and as a result, "[t]he business was growing" and "doing well." He noted, "that's a reflection of a lot of the work that we've done internally, whether it's the inventory management, it's our pricing, is our savings, it's the omnichannel experience, continue to make that better." He continued, "So I think there's this performance is both market driven. I think it's also driven by us."

34.     Also on June 20, 2025, Defendants reported CAF's $102 million loan loss provision for 1Q26, compared to $68 million in the prior quarter, and $81 million in the first quarter of 2025 ("1Q25"). Daniels downplayed the escalation in loan-loss provisioning by stating, "Q1 is a seasonally higher sales and lower credit quality period requiring a larger provision for newly originated volume" and that "loss performance within the quarter, particularly within 2022 and 2023 [loan] vintages, along with the uncertain economic outlook necessitated additional loss reserves." To further temper investor concerns regarding increased provisioning, Daniels concluded that "[w]hile we remain focused on increasing our penetration across the credit spectrum, we also want to carefully manage future risk from higher profit, higher loss receivables."

35.     Nash echoed Daniels' assurances, stating that the CAF 1Q26 loan loss provision increase was sufficient at the time and "primarily driven by the '22 and '23 vintages," but minimized the increase in the provisioning's negative impact on CAF financing by highlighting that CAF loans were still "profitable." Later in the call, Daniels reassured investors once again that loan losses were appropriately adjusted and at maximum levels in 1Q26, stating, "we would expect Q1 to be the high watermark here. We've made the adjustment that we believe needs to be made on those older vintages."

36.    While falsely assuring the market of the strength of the Company's business model, Defendants admitted they had access to, and were continuously monitoring, evaluating, and reacting to precise data regarding the Company's loan loss provisions and increased delinquencies in its CAF portfolio, inventory management and pricing, and consumer demand resulting from not only macroeconomic factors but the Company's internal actions taken to increase growth.  In fact, Defendants repeatedly acknowledged this, stating, for example:

- Nash, June 20, 2025 conference call: "The business was growing, was doing well.  And I think that's a reflection of a lot of the **work that we've done internally**, whether it's the inventory management, it's our pricing, is our savings, it's the omnichannel experience, continue to make that better."

- Daniels, June 20, 2025 conference call: Confirmed that Defendants were "**watching**" the CAF portfolio, including for the potential impact that student loan repayment obligations would have on repayments, stating "**for years now** with the thought of our payment is going to be made, what forgiveness is done for those – and how they performed."

- Mayor-Mora, June 20, 2025 conference call: "[W]e will also be **assessing additional off-balance sheet funding levers** to further accelerate CAF penetration while **continuing to learn from** our full spectrum models."

- Daniels, September 25, 2025 conference call: "Typically, people that buy in a more stressed environment, perform usually better.  Now again, we think we have reserved.  **We watch very carefully how those guys are performing**."

- Daniels, September 25, 2025 conference call: "But all in all, if you look at overall delinquency rates, **we're really looking at it by vintage**.  **We're looking at it**."

- Daniels, September 25, 2025 conference call: "So as **we watched that customer perform, we saw it and thought maybe it was a pull forward in losses**.  Ultimately, as **we saw a little increase**, so maybe a timing curve adjustment.  And then **we watched that customer begin to struggle and continue to struggle a little bit**.  **We made some adjustments** that we thought were very smart for the consumer and smart for us, and that has proven to be the case.  And that **was we adjusted our extension policy in the fall.  We saw more payments come in**, had we otherwise not done that.  So **we were pleased to see that, but we had to watch that play through**.  **We saw some of those customers coming back into delinquency and loss during Q1**."

- 16 -

- Nash, September 25, 2025 conference call: "But certainly, *we put ourselves in a better position* with the start of this quarter, both on *an inventory position as well as from a pricing standpoint*."

- Nash, September 25, 2025 conference call: "First, we *ramped* our inventory ahead of the second quarter to support this growth.  Across the back half of May through the end of June, *we saw* about $1,000 in depreciation, which natively impacted our price competitiveness and our sales*. . . .* In the second quarter, *we responded by* lowering retail margin to drive sell-through, and we intentionally slowed buys to balance our inventory with sales."

- Nash, September 25, 2025 conference call: "This quarter's buy performance is a direct result of a *decision to pull back offers* to right size inventory. We are *no longer intentionally slowing buy* and expect to see year-over-year improvement in the third quarter."

- Nash, September 25, 2025 conference call: "[L]ook, there's always elasticity when it comes in -- we've talked about this before.  We know pretty much because we're *constantly testing*, *when you take prices down a certain dollar amount, we know what you get for that*."

- Nash, September 25, 2025 conference call: "And you saw in the quarter, we saw that $1,000 depreciation over a month period, and *we started acting on it very quickly*."

37.     The Company's SEC filings, leading up to and during the Class Period, specifically the FY25 Form 10-K and the 1Q26 and 2Q26 Forms 10-Q, similarly highlighted management's involvement in monitoring and analyzing CAF's operating results and financial performance, including access to its underwriting models, credit losses and delinquencies, as well as its omnichannel platform, stating:

- "Management *regularly analyzes* CAF's operating results by assessing the competitiveness of our consumer offer, *profitability, the performance of its auto loans*, including trends in *credit losses and delinquencies*, and CAF direct expenses."

- "CAF uses a combination of the initial credit grades and historical performance to *monitor* the credit quality of the auto loans held for investment on an ongoing basis.  *We validate the accuracy of the scoring models periodically*.  Loan performance is *reviewed on a recurring basis* to identify whether the assigned grades adequately reflect the customers' likelihood of repayment."

- CODM "*reviews the performance* of our CarMax Sales Operations segment at the gross profit level, the components of which are presented within the consolidated statements of earnings.  The CODM uses gross profit to *assess financial performance, monitor forecasted versus actual results and adjust pricing strategy* . . . .  The CODM *reviews CAF income* to assess CAF's performance and *make operating decisions*, including resource allocations."

- "We *monitor macroeconomic factors and pricing elasticity* and *adjust* our pricing accordingly to optimize unit sales and profitability while also maintaining competitively priced inventory."

- "We continue to *learn from our new underwriting models* and corresponding tests currently in place and anticipate capturing additional volume beyond Tier 1 during the back half of fiscal 2026."

- "Our proprietary digital technology *provides our management with real-time information* about many aspects of our omni-channel operations, such as *inventory management, pricing*, vehicle transfers, wholesale auctions and sales consultant productivity."

- "Our omni-channel experience provides a *common platform across all of CarMax* that leverages our scale, nationwide footprint and infrastructure and empowers our customers to buy a vehicle on their terms, whether online, in-store or through a seamless combination of both."

38.     Defendants were further incentivized to monitor CarMax's financial performance due to the Company's "pay-for-performance philosophy."  According to the Company's May 8, 2025 Proxy Statement, "as our executives assume more responsibility, we generally increase the percentage of their compensation that is performance-based."  The Company "grant[s] long-term equity awards to tie our executives' long-term compensation directly to CarMax's stock price and to drive the achievement of our strategic goals."  Annual incentive bonus performance goals are set during the Company's April and May meetings, during first quarter of the fiscal year and are "intended to drive key short-term strategic imperatives for the year" including "financial performance, market share growth" and "operational execution."  In FY25, 50% of performance targets were based on CarMax's EBIT, and 6.25% was based on credit and funding such as implementing the "full spectrum credit model."  Notably, in FY25, the Company increased the

annual incentive bonus performance adjustment factor to 159.9%, from 66.4% in fiscal 2024 and 48.7% in fiscal 2023.  For FY25, 91% of Nash's total $17.1 million compensation and 77% of Mayor-Mora's total $4 million compensation was performance based.   Nash received approximately $10.5 million in long-term equity awards, and $3.4 million in annual incentive bonuses.  Mayor-Mora received approximately $1.8 million in long-term equity awards, and $1.17 million in annual incentive bonuses.

**D.      Defendants Finally Reveal Massive Losses Within CarMax's CAF Portfolio Requiring Significant Loan Loss Provisions and Terminate CEO Nash Due to the Company's Poor Financials and Declining Business Outlook**

39.      Investors first learned of the full extent of concerns with the credit quality of CAF's portfolio on September 25, 2025, when Defendants revealed weaker than expected year-over-year 2Q26 financial results, reflecting sharp declines across multiple key performance metrics, including a 24.7% decline in diluted earnings per share ("EPS") to $0.64.  During the Company's conference call, Mayor-Mora directly attributed the 24.7% EPS decline in part to the Company's 2Q26 "CAF loss provision adjustment."  Specifically, despite Defendants' previous assurances that CAF loan loss provisioning was at its "high watermark," in 1Q26 CarMax increased its provisions for loan losses to $142.2 million for 2Q26, resulting in CAF income decreasing by more than 27% from previous quarter and over 11% over 2Q25.  CarMax explained that its 2Q26 provision for loan losses "included an increase of $71.3 million in [its] estimate of lifetime losses on existing loans, primarily due to worsening performance among the 2022 and 2023 vintages."

40.      Further, by knowingly or severely recklessly understating the Company's loss provisions for its CAF loans, Defendants caused the Company's 1Q26 financial statements filed with the SEC to be materially misstated in violation of generally accepted accounting principles ("GAAP") and SEC disclosure requirements.  *See* §V.C., *infra*.  Specifically, Defendants' reported financial results materially overstated CAF's 1Q26 income by at least 23% ($33 million divided

- 19 -

by \$141.7 million) and CarMax's 1Q26 consolidated earnings before taxes by at least 12% (\$33 million divided by \$283.1 million).

41.    Defendants also revealed that, contrary to earlier representations that CarMax was not "see[ing] any impact on [its] business" from consumer "financial[] stress[]" related to macroeconomic factors like tariff speculation, Nash disclosed that the "uptick" in sales in "March and . . . April" was in fact driven by macroeconomic factors causing customer's anticipating increased vehicle pricing.  Defendants further revealed that the Company's underperformance in retail in 2Q26 was partly due to Company-specific inventory actions taken *in* 1Q26.  Nash explained that as a result of increasing inventory "[a]cross the back half of May through the end of June," the Company "saw about \$1,000 in depreciation" per used retail unit, and that the Company's "buying . . . up" of "inventory" from 1Q26, combined with this depreciation, were the "most impactful" in driving 2Q26 used unit sales declines.  He further revealed that the Company had to "lower[] retail margin to drive sell-through [of that oversupply in inventory]" and that it "intentionally slowed buys to balance our inventory with sales."  Nash confirmed that the reported quarterly \$200 decline in retail gross profit per used unit ("retail GPU") is attributable to "the actions" CarMax intentionally undertook.  As a result, Nash acknowledged that in 2Q26, "we fell into a spot where we weren't as competitive," and that CarMax's "price" and "sales" were negatively affected.

42.    The market was clearly shocked by Defendants' September 25, 2025 partial revelations, causing the price of CarMax common stock to *fall 20%*, or \$11.45 per share, from its closing price of \$57.05 per share on September 24, 2025, to close at \$45.60 per share on September 25, 2025.

43.    Not long after, on November 6, 2025, CarMax issued a Form 8-K stating that Nash was abruptly "terminated" on November 4, 2025, and had resigned from the Board.  The Company also announced an unexpected poor 3Q26 preliminary outlook, including a 8%-12% decrease in comparable store used unit sales and net earnings per diluted share of $0.18-$0.36.  The 3Q26 financial results were "impacted" by several factors, including "a decline in retail unit sales" demonstrating significantly decreased demand for CarMax's vehicles. In response to these disclosures, the price of CarMax common stock *plummeted another 24%*, or $9.93 per share, from a closing price of $40.81 per share on November 5, 2025, to a closing price of $30.88 per share on November 6, 2025.

44.    After the Class Period, during the Company's December 18, 2025 conference call with investors, Defendants provided further confirmation that Nash's sudden termination was linked to the Company's poor performance, with newly appointed Non-Executive Chairman Thomas J. Folliard ("Folliard") stating, "recent results have been unacceptable and do not reflect the company's potential.  As a result, even though the Board was already working on a succession plan, we determined that more immediate change was required, and that direct involvement from David and myself was the best approach to strengthen the business in the long term.  The Board has been searching for a permanent CEO with urgency."  Folliard further stated that the Company was specifically seeking a "proven leader" who can "drive sales" and "maximize the benefits of [the] [Company's] omnichannel experience," and "improve operations."  Folliard concluded the call telling the market twice that CarMax was "committed to getting this right."

45.    The dramatic declines in CarMax's common stock price following the corrective disclosures on September 25, 2025 and November 6, 2025, in addition to the negative analyst commentary, demonstrate that the market was shocked by the negative information disclosed on

those dates.  Indeed, as a result of these disclosures, the price of CarMax common stock has declined from a Class Period high of over $68.00 per share to less than $30.88 per share at the end of the Class Period, causing Lead Plaintiff and the Class to suffer millions of dollars in losses and economic damages under the federal securities laws.

### E.    Post-Class Period Events

46.    In addition to Folliard's December 18, 2025 statements above, additional post-Class Period events provided further detail on Defendants' fraud and its materiality to investors.

47.    On March 11, 2026, Starboard Value LP, an activist hedge fund and stockholder of CarMax delivered a letter to incoming CEO Keith Barr ("Barr") and the Company's Board nominating two individuals to the CarMax board, including Starboard's CEO Jeff Smith ("Smith").  In the letter, Starboard noted CarMax's failings were within the Company's control, stating, "as you know, the Company's recent performance has fallen well short of its underlying potential.  We believe these problems are fixable."

48.    CarMax issued a press release that same day in response to the letter, wherein Folliard reiterated that "[t]he CarMax Board has taken a series of steps to improve the performance of the business, including accelerating its succession planning in early November by installing interim leadership."  On that same day, Smith participated in a Bloomberg interview where he opined that CarMax had become "complacent," resulting in increased competition, from "notably Carvana, especially with the digital experience."

49.    On March 17, 2026, CarMax issued a stakeholder letter from Barr discussing CarMax's priorities going forward, which included a *mea culpa* to shareholders acknowledging "that change is needed," and that CarMax needed to "operate with a sense of urgency" stating:

> To Our Shareholders: ***Our recent sales performance has not reflected our potential.***  When you look at the size of the opportunity in front of us, alongside our growth trends over the past several years, ***it's clear that change is needed***.  To

turn our performance around in this highly competitive environment, we **will operate with a sense of urgency** as we improve customer offerings, drive efficiencies, and strengthen our business model to drive the growth and returns this company is capable of delivering.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    1Q26 Materially Misleading Statements and Omissions

50.    The Class Period begins on June 20, 2025, when before the market opened, CarMax issued a press release announcing the Company's financial results for the quarter ended May 31, 2025 ("1Q26 Release").[3]    The 1Q26 Release highlighted the Company's "fourth consecutive quarter of positive retail comps and double-digit year-over-year earnings per share growth," and reported a 42.3% increase in net EPS to $1.38, a 9.0% increase in retail used unit sales, an 8.1% increase in comparable store used unit sales, and a 1.2% increase in wholesale unit sales.  The 1Q26 Release further reported **CAF income of $141.7 million**, and **an allowance for loan losses of $474.2 million as of May 31, 2025**.

51.    In the 1Q26 Release, Nash touted "**the strength of our earnings growth model**, which is **underpinned by our best-in-class omni-channel experience, the diversity of our business, and our sharp focus on execution**" as a "key differentiator in a very large and fragmented market that **positions us to continue to drive sales, gain market share, and deliver significant year-over-year earnings growth for years to come**."

52.    On the same day, CarMax held a conference call with analysts to discuss the Company's financial and operational results for 1Q26, which was hosted by Nash, Daniels, and Mayor-Mora.  During the call, Nash highlighted that "[f]irst quarter retail gross profit per used unit

---

[3]    CarMax's quarterly press release was also filed that same day with the SEC on Form 8-K.

was an all-time record, ***driven by strong demand*** and operating efficiencies across our logistics network and reconditioning operations.”

53.    In his prepared remarks, Daniels addressed ***CAF's $102 million loan loss provision*** for 1Q26, compared to $68 million in the prior quarter, and $81 million in 1Q25.  Daniels downplayed the escalation in loan loss provisioning by stating, “Q1 is a ***seasonally higher sales and lower credit quality period requiring a larger provision for newly originated volume***” and that “***loss performance within the quarter, particularly within 2022 and 2023 [loan] vintages, along with the uncertain economic outlook necessitated additional loss reserves***.”  Daniels continued, “[t]he last noteworthy item impacting the Q1 provision ***relates to CAF's continued build-out of our full spectrum lending capabilities***.”  To assuage investor concerns regarding increased provisioning, Daniels concluded that “[w]hile we remain focused on increasing our penetration across the credit spectrum, ***we also want to carefully manage future risk from higher profit, higher loss receivables***.”

54.    During the question and answer portion of the 1Q26 call, and in response to a question from a BNP Paribas analyst regarding the loan loss provisioning “allowance stepping up” in 1Q26, and how much of the increase was due to the “macro environment,” Daniels assured investors that the Company's 1Q26 loan loss provisioning was accurately aligned with the 2022 and 2023 loan losses the Company was facing, that Defendants carefully monitored, stating, “the ‘22 and ‘23 vintages certainly were ones that performed more unfavorably in the quarter, and we think ***we have appropriately reserved and adjusted accordingly***.”

55.    Nash echoed Daniels' assurances, stating that the CAF 1Q26 loan loss provision increase was sufficient at the time and “primarily driven by the ‘22 and ‘23 vintages,” but minimized the increase in the provisioning's negative impact on CAF financing by highlighting

that CAF loans were still "profitable," stating, "*even with that, they're still super profitable, and then, to a lesser degree*, the kind of the economic factors as you lean forward, not immaterial, *but I want to make sure everybody understands it's more of the '22, '23 that are driving that. And even with that, they're still very, very profitable*."

56.    Later in the call, Daniels responded to a J.P. Morgan analyst's question about "how the second quarter might look" ffor loan loss provisioning and reassured investors once again that loan losses were appropriately adjusted and at maximum levels in 1Q26 , stating, "*we would expect Q1 to be the high watermark here. We've made the adjustment that we believe needs to be made on those older vintages*."

57.    Also during the call, an Oppenheimer analyst emphasized the Company's "acceleration" and growth in the "used car business" during the quarter, and specifically asked, "how are you viewing the sustainability here? Is – as you're looking at this, is the business coming back? Is there anything unique to this reacceleration?" In response, Nash stated, "*it's driven some by the macro factors, but I also think it's driven some by with what we have can control*." Nash acknowledged but tempered the impact that "*speculation about the tariffs*" had on the Company's fourth quarter 2025 ("4Q25") and 1Q26 increased financial performance, instead attributing the "uptick" in growth in March and April of 1Q26 to the Company's own "work," stating:

> And I would go back to some remarks I made in the last [4Q25] quarterly call, which is the quarter started off strong and then we saw an uptick at the end of the quarter when there was speculation about the tariffs. And then I talked about that uptick towards the latter part of March and then rolling into April, we saw another little uptick. And so April ended up being the strongest month for us.
>
> *The business was growing, was doing well. And I think that's a reflection of a lot of the work that we've done internally, whether it's the inventory management, it's our pricing, is our savings, it's the omnichannel experience, continue to make that better. So I think there's this performance is both market driven. I think it's also driven by us.*

58.    Additionally, when asked about "how financially stressed is the consumer right now in your opinion," Nash again emphasized actions taken by Defendants to increase demand and the inconsequential impact that macroeconomic factors were having on consumer buying, stating:

> *We haven't seen any impact on our business*.  But I think there's also a little bit of kind of *wait and see* on tariffs.
>
> While tariffs have impacted some prices.  *I think there's – a lot of stuff was already – a lot of things were already in the US* before tariffs kicked in.  So I think really, need to watch going forward as prices go up on for everyday consumables, how that might push them.  But I would say from a consumer sentiment standpoint, they're probably a little less positive about the future, *but I don't think it's necessarily showed up so much in the buying habits at this point*.

59.    Analysts reacted positively to Defendants' statements.  A June 20, 2025 report from William Blair noted: "The strength reflected both macro factors (including tariff-related demand) and internal factors (inventory management, pricing, and the company's enhanced omnichannel experience), with CarMax's NPS [Net Promoter Score] the highest since the nationwide rollout of its digital capabilities (inclusive of record-high online and omnichannel scores)."  A June 23, 2025 BNP Paribas report stated, "Carmax mgt. are not sitting idly by.  They've taken many actions including separating from chief growth officer, moving to centralized reconditioning model, pushing more into subprime (where encroachment risk is greatest), and moving to gain on sale to alleviate near-term EPS pressure as they push deeper into subprime.  They also continue to look for cost efficiencies."

60.    On June 26, 2025, CarMax filed with the SEC a quarterly report on Form 10-Q for the quarter ended May 31, 2025 ("1Q26 Form 10-Q"), which was signed by Nash and Mayor-Mora. The 1Q26 Form 10-Q reiterated the Company's financial results, including *CAF income of $141.7*, and *reported consolidated earnings before taxes of $283.1 million*.  The 1Q26 Form 10-Q also detailed Defendants' monitoring of the CAF portfolio and the Company's active "new

underwriting models and corresponding tests," that help Defendants "adjust [the Company's]

origination strategy as needed" stating:

> ***We continue to learn from our new underwriting models and corresponding tests currently in place*** and anticipate capturing additional volume beyond Tier 1 during the back half of fiscal 2026. ***We will continue to monitor consumer behavior and the broader economy and will adjust our origination strategy as needed.***

61.     The 1Q26 Form 10-Q also discussed the "15 basis point" increase in CarMax's

allowance for loan losses, stating:

> During the first three months of fiscal 2026, the allowance for loan losses as a percent of total auto loans held for investment increased by 15 basis points. ***The increase was primarily driven by unfavorable loan loss performance, particularly within loans originated in 2022 and 2023, when average selling prices were elevated and these customers were later challenged by the inflationary environment . . . . The allowance for loan losses as of May 31, 2025 reflects our best estimate of expected future losses based on recent trends in delinquencies, loss performance, recovery rates and the economic environment.***

62.     The 1Q26 Form 10-Q incorporated risk factors disclosed in the Company's FY25

Form 10-K.   For example, CarMax included a risk factor on "credit losses in its CAF business,"

and how they "may" or "could" have a negative impact on CarMax's business in the future, stating:

> **We may experience greater credit losses in CAF's portfolio of auto loans receivable than anticipated.**
>
> We are exposed to the risk that our customers who finance their purchases through CAF will be unable or unwilling to repay their loans according to their terms and that the vehicle collateral securing the payment of their loans may not be sufficient to ensure full repayment.   Credit losses are inherent in CAF's business and ***could*** have a material adverse effect on our results of operations.
>
> We make various assumptions and judgments about CAF's portfolio of auto loans receivable and provide an allowance for loan losses based on a number of factors. Although management will establish an allowance for loan losses it believes is appropriate, this allowance ***may*** not be adequate.   For example, when economic conditions deteriorate unexpectedly, additional loan losses not incorporated in the existing allowance for loan losses ***may*** occur.   Losses in excess of the existing allowance for loan losses ***could*** have a material adverse effect on our business, results of operations and financial condition.

63.    The statements set forth above in ¶¶50-58, 60-62, were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a)    CarMax's loans were underperforming significantly more than Defendants acknowledged in CarMax's 1Q26 Release and conference call.    Defendants materially misrepresented in 1Q26 that CarMax's 1Q26 loan loss provisions were $102 million, CAF income was $141.7 million and consolidated earnings before taxes was $283.1 million, and omitted material information when, for example, Daniels falsely stated that CarMax had "appropriately reserved and adjusted [1Q26 loan reserves] accordingly," "made the adjustment that we believe needs to be made on those older vintages," and that the 1Q26 provision was "the high watermark." But as detailed in ¶¶96-97, §V.C., the Company's 1Q26 loan loss provisions were actually insufficient to counter the rising delinquencies in the Company's CAF portfolio as of 1Q26, including its 2022 and 2023 vintage loans.  The very next quarter CarMax increased its loan loss provisions by an astonishing $142.2 million, which included $71.3 million primarily due to worsening performance among the 2022 and 2023 vintages with Defendants admitting that they "saw some of those customers coming back into delinquency and loss during Q1";

(b)    Defendants further omitted material information during the 1Q26 conference call when they blamed the 1Q26 increase in loan loss provisions on "a seasonally higher sales and lower credit period" as opposed to the increased risk of default stemming from the Company's actions to take on poorer quality loans, as detailed in ¶¶24-29, 32, 96-97, §V.C.  In fact, these statements were also misleading because they were inconsistent with the Company's actions taken in 1Q25 when sales increased by 39,075 units and in response, Defendants *decreased* the loan loss provision by 8% per unit ($416.14/used car to $384.59/used car);

(c)    CarMax's purported risk factor regarding credit losses in CAF's portfolio was also materially misleading, because the statements therein were phrased to investors as risks that had not yet materialized, when in truth, and as detailed ¶¶96-97, §V.C., the reported 1Q26 allowance for loan losses was *not* adequate at the time the risk warning was issued, additional loan losses beyond those reported by the Company in 1Q26 *had already* occurred, and the Company's actual loan losses as of 1Q26 *were already* having a material adverse effect on CarMax's business, results of operations and financial condition;

(d)    Defendants' statements in the 1Q26 Form 10-Q that the Company's "new underwriting models and corresponding tests currently in place" and that Defendants "continue to monitor consumer behavior and the broader economy and will adjust our [CAF portfolio] origination strategy as needed" were misleading.  As detailed in ¶¶36-38, §V.C., Defendants possessed corroborating data demonstrating the true (but concealed) increase in CAF loan delinquencies during 1Q26, and Defendants either knew or acted with severe recklessness in failing to adjust for the continued losses in 1Q26 in CarMax's CAF portfolio, including for the losses on the 2022 and 2023 loan vintages;

(e)    Defendants' statements in their 1Q26 conference call stating that the loan loss provision was adequate and the provision was at the "high watermark," were materially false.  As detailed in ¶¶96-97, §V.C., had CarMax been properly accounting for the credit losses on the 2022 and 2023 vintage loans in accordance with GAAP, at least $33 million of the $71 million true up adjustment taken in 2Q26 would have been recorded no later than fiscal 1Q26.  This under provisioning materially overstated CAF's 1Q26 income by at least 23% ($33 million divided by $141.7 million) and CarMax's 1Q26 consolidated earnings before taxes by at least 12% ($33 million divided by $283.1 million);

(f)      Defendants falsely attributed the increase in 1Q26 demand and the Company's growth to "the strength of our earnings growth model" and "a reflection of a lot of the work that we've done internally," and misleadingly denied that any "acceleration" in growth was due to predominantly "macro factors." As detailed in ¶99, Defendants admitted in 2Q26 that the "uptick" in 1Q26 demand was largely driven by macroeconomic factors, including tariff -related pull-forward purchases by customers;

(g)      In May of 2025, *i.e.*, during 1Q26 and before Defendants' 1Q26 statements, Defendants knew or disregarded with severe recklessness that, in fact, CarMax had an oversupply of inventory which caused a substantial decrease in car prices. As detailed in ¶¶98, 100, Defendants admitted in 2Q26 that "across the back half of May through the end of June," the Company "saw about a $1,000 per car depreciation" per used retail unit, and that "buying . . . up" of "inventory" from 1Q26 combined with this depreciation, were the "most impactful" in driving 2Q26 used unit sales declines; and

(h)      As a result, Defendants' statements regarding CarMax's business, operations, and prospects were materially false and misleading or lacked a reasonable basis when made.

## B.      2Q26 Materially Misleading Statements and Omissions

64.      On September 25, 2025, before the market opened, CarMax issued a press release announcing the Company's financial results for second quarter ended August 31, 2025 ("2Q26 Release"). As detailed more fully below in ¶¶96-102, in the 2Q26 Release Defendants disclosed weaker than expected year-over-year 2Q26 financial results reflecting sharp declines across multiple key performance metrics, and an unexpected increase of $142.2 million for the quarter in its provision for loan losses, resulting in CAF income decreasing by more than 11%. In an attempt

to temper this news, Nash noted in the 2Q26 Release that Defendants "remain[ed] confident in our long-term strategy and the strength of the earnings model that we have built."

65.    The same day, CarMax also held a conference call with analysts to discuss the Company's financial and operational results for 2Q26, hosted by Nash, Daniels, and Mayor-Mora.

66.    To soften the negative news, during the call, Nash emphasized the strength of the Company's "*differentiated and best-in-class omnichannel customer experience*" as driving the Company's market share growth and reiterated that Defendants are "focused on maximizing that advantage by driving operational efficiency and sharpening our go-to-market approach." Nash further highlighted:

> Our customer-centric car buying and selling experience is a *key differentiator* in a very large and fragmented market and *positions us well for the future*. We are intently focused on driving this differentiated and best-in-class experience and doing so with greater efficiency.
>
> As you heard from us today, *we're actively executing on our key priorities, which include driving sales, advancing innovations to improve customer and associate experiences, bolstering our marketing efforts, increasing company-wide efficiencies and expanding CAF participation across the credit spectrum*. All of these priorities will give us added flexibility and strengthen us for the future.

67.    A Mizuho Securities analyst asked Defendants to "piece all [of it] together" while referencing "the aggressive environment" and car market at the "industry level" and whether there are "macro cracks forming with these CAF adjustments" or "any other signals of a more strained consumer" or if it was "more of a competitive element in Q2 versus other players in that sector." In response, Nash downplayed any concerns, again touting the Company's "differentiated and best-in-class experience," stating "[a]s I think about the full year, we set out this year to gain market share. And look, *through the first half of the year, we feel good about it* . . . ." He added, "*But we're not backing off of our stance, like we started this year going after market share*. And

at this point, ***I don't see a reason why we would back off that.  We expect to gain market share for the full year***."

68.     These statements set forth above in ¶¶66-67, were materially misleading or omitted material information necessary to make them not misleading because CarMax's "differentiated and best-in-class omni-channel customer experience," was not successfully increasing market share, Defendants were not successfully "driving sales," and CarMax was seeing the negative impact of ongoing and increasing competition as of September 25, 2025.  Indeed, as detailed in ¶¶103-105, just a few weeks later Defendants disclosed Nash's termination and poor 3Q26 preliminary outlook "[b]ased on the latest financial results," including an 8%-12% decrease in comparable store used unit sales and net earnings per diluted share of $0.18-$0.36, due to several factors, including "a decline in retail unit sales."

69.     Despite negative reactions to the disappointing news concerning the Company's increase of its loan loss provision, analysts embraced Defendants' continued positive statements concerning the Company's "key differentiator[s]" driving CarMax's business.  A September 25, 2025 RBC Capital Markets report maintained its "Outperform" rating and stated: "With established omnichannel capabilities, an attractive older vehicle offering, and strong cash flow, CarMax is well positioned to continue driving share gains for the foreseeable future, in our view. Our price target supports our Outperform rating."

### C.     Defendants' Class Period Statements Violated GAAP

70.     In violation of GAAP, CarMax materially understated its provision for loan losses and overstated its consolidated earnings before income taxes and CAF income by at least $33 million no later than 1Q26 ending May 31, 2025.

71.     During the Class Period, CarMax's quarterly financial results were reported on Forms 10-Q and its annual results were reported on Forms 10-K.  CarMax also reported its

quarterly and annual financial earnings in press releases to the public, filed on Form 8-K with the SEC. Specifically, on June 20, 2025, CarMax issued its 1Q26 Form 10-Q, which was signed by Mayor-Mora and Nash. The 1Q26 Form 10-Q falsely represented that "These interim unaudited *consolidated financial statements have been prepared in conformity with U.S. generally accepted accounting principles ('GAAP') for interim financial information*."[4]

72.    In addition, the 1Q26 Form 10-Q reported consolidated earnings before taxes of $283.1 million and CAF income of $141.7 million.

73.    As alleged in ¶56, during the 1Q26 conference call, Defendants assured investors that although CarMax's loan provisions were increasing, they were at the "high watermark." These representations, as well as the financial results contained in the 1Q26 Release and 1Q26 Form 10-Q, were materially false and misleading because as detailed below, the financial results were *not* a fair statement of CarMax's actual financial results and were *not* prepared according to GAAP.

### 1.    GAAP Requirements

74.    CarMax's accounting for loan loss reserves is governed by ASC 326 Financial Instructions – Credit Losses, which provides guidance on the accounting for credit losses for most

---

[4]    GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued the Statement of Financial Accounting Standards No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No.162*. FASB Accounting Standards Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.  The ASC did not change GAAP.

financial assets and certain other instruments that are not measured at fair value through net income. In accordance with ASC 326, CarMax was required to report its 1Q26 CAF loans "net [of the] amount expected to be collected on the financial asset . . . At the reporting date, an entity shall record an allowance for credit losses on financial assets . . . . An entity shall report in net income (as a credit loss expense) the amount necessary to adjust the allowance for credit losses for management's current estimate of expected credit losses on financial asset(s)."[5]

75. ASC 326 explicitly requires that:

An entity shall not rely solely on past events to estimate expected credit losses. When an entity uses historical loss information, *it shall consider the need to adjust historical information to reflect the extent to which management expects current conditions and reasonable and supportable forecasts to differ from the conditions that existed for the period over which historical information was evaluated. The adjustments to historical loss information may be qualitative in nature and should reflect changes related to relevant data (such as changes in unemployment rates, property values, commodity values, delinquency, or other factors that are associated with credit losses on the financial asset or in the group of financial assets)*.[6]

\*    \*    \*

When developing an estimate of expected credit losses on financial asset(s), an entity shall consider available information relevant to assessing the collectability of cash flows. This information may include internal information, external information, or a combination of both relating to past events, current conditions, and reasonable and supportable forecasts. *An entity shall consider relevant qualitative and quantitative factors that relate to the environment in which the entity operates and are specific to the borrower(s)*.[7]

\*    \*    \*

---

[5] ASC 326-20-30-1.

[6] ASC 326-20-30-9.

[7] ASC 326-20-30-7.

An entity's estimate of expected credit losses shall include a measure of the expected risk of credit loss *even if that risk is remote*, regardless of the method applied to estimate credit losses.[8]

76.    Just prior to the start of the Class Period, in its FY25 Form 10-K, CarMax assured investors that:

> *Allowance for Loan Losses.*  The allowance for loan losses . . . represents the net credit losses expected over the remaining contractual life of our managed receivables.  The allowance for loan losses is determined using a net loss timing curve method ("method"), primarily based on the composition of the portfolio of managed receivables and historical gross loss and recovery trends . . . . The output of the method is adjusted to take into account reasonable and supportable forecasts about the future.  Specifically, the change in U.S. unemployment rates and the National Automobile Dealers Association used vehicle price index are used to predict changes in gross loss and recovery rates, respectively.  An economic adjustment factor, based upon a single macroeconomic scenario, is developed to capture the relationship between changes in these forecasts and changes in gross loss and recovery rates . . . . We periodically consider whether the use of alternative metrics would result in improved model performance and revise the models when appropriate.  *We also consider whether qualitative adjustments are necessary for factors that are not reflected in the quantitative methods but impact the measurement of estimated credit losses.*  Such adjustments include the uncertainty of the impacts of recent economic trends on customer behavior.  The change in the allowance for loan losses is recognized through an adjustment to the provision for loan losses.
>
> *         *         *
>
> While . . . income is earned over time**, *the provision for lifetime losses is recognized at the time of origination.*  We believe our unique finance platform with a full-spectrum in-house lending operation, coupled with a robust network of partner lenders, will strengthen our competitive advantage . . . . The provision for loan losses reflects changes in the allowance for loan losses.  Changes to the allowance are primarily driven by loss and delinquency experience, economic factors on *our outlook for net losses expected to occur over the remaining contractual life of the loans receivable as well as changes in the mix of credit quality of originations*.[9]

---

8    ASC 326-20-30-10.

9    *Id*. at 36.

### 2.    2022 and 2023 Loan Vintages

77.    Leading up to the start of the Class Period, Defendants repeatedly told investors that increases in quarterly and annual CAF loan loss provisions were primarily due to the 2022 and 2023 loan vintages experiencing higher losses than expected.

78.    For example, in its 2Q25 Form 10-Q, Defendants told investors that macro-economic factors and increased prices negatively impacted these 2022 and 2023 vintages.  In the Company's 2Q25 Form 10-Q, Defendants further stated:

> The provision for loan losses resulted in expense of $112.6 million and $193.8 million in the second quarter and first six months of fiscal 2025 . . . . The increases in the provision for loan losses in both periods were primarily driven by unfavorable loss performance.  *We experienced higher losses for receivables originated in 2022 and 2023, when average selling prices were elevated and these customers were later challenged with the macro-inflationary environment* . . . . While the loan loss reserve was adjusted for these receivables during the first quarter of fiscal 2025, further deterioration was observed during the second quarter, resulting in an additional adjustment to the reserve.

79.    Defendants also explained in its September 26, 2024 press release for 2Q25 that:

> CarMax Auto Finance (CAF) income of $115.6 million, a decline of 14.4% from last year's second quarter as an increase in *the provision for loan losses outweighed growth in CAF's average managed receivables* and a stable net interest margin percentage.

80.    CarMax repeated this explanation when making a year-over-year comparison in the Company's Form 10-Q for 3Q25 filed on January 7, 2025, with CarMax once again representing:

> The provision for loan losses resulted in expense of $72.6 million and $266.4 million in the third quarter and first nine months of fiscal 2025, respectively, compared with expense of $68.3 million and $239.0 million in the third quarter and first nine months of fiscal 2024, respectively.

> The increase in the provision for loan losses for the first nine months of fiscal 2025 was primarily driven by unfavorable loss performance.  *We experienced higher losses for receivables originated in 2022 and 2023, when average selling prices were elevated and these customers were later challenged with the macro-inflationary environment*.

81.     In its FY25 Form 10-K, CarMax again represented that CAF's loan provision was under control and adequate for the Company's portfolio:

> For the remainder of fiscal 2026, *we anticipate the quarterly provision to decrease slightly from the seasonal peak* in the first quarter but remain elevated relative to our fourth quarter fiscal 2025 provision. *Despite the anticipated increase in our provision, we expect CAF income to increase in fiscal 2026.*

82.     In CarMax's FY25 conference call held on April 10, 2025, and in response to a question from an ISI Analyst, Daniels assured investors that CAF income would "trump[]" the loan loss provision, stating:

> Q: Michael Montani Evercore ISI - Analyst
>
> And then secondly, when could we think about the added penetration turning into a win? I guess more specifically, can you grow CAF profits if provisioning have to step up that much for this year?
>
> A: Jon Daniels Carmax Inc. - EVP, CarMax Auto Finance
>
> Yeah. And let's see your second question, do we see given the provision growth in CAF income? Short answer is absolutely yes. We see a growth in FY26 for CAF income. On top of the provision, that comes from strong net interest margins, obviously mentioning our expenses and all of that. *But yeah, we absolutely see growth within the year and then obviously strong growth beyond that as the provision is trumped by the overall income we're going to gain*.

83.     Two months later, in its 1Q26 Form 10-Q, CarMax reported an increase in its loan loss provision, stating:

> CAF Income (Decrease of $5.3 million, or 3.6%, in the first quarter of fiscal 2026). *The decrease in CAF income for the first quarter of fiscal 2026 reflects an increase in the provision for loan losses*, partially offset by an increase in the interest margin percentage . . . . The provision for loan losses resulted in expense of $101.7 million in the first quarter of fiscal 2026 compared with $81.2 million in the first quarter of fiscal 2025. The increase in the provision for loan losses for the first three months of fiscal 2026 was *primarily driven by unfavorable loss performance, primarily within loans originated in 2022 and 2023, when average selling prices were elevated and these customers were later challenged by the inflationary environment*.

84.     During 1Q26 Defendants attributed the increased loan losses to the 2022 and 2023 loan vintages based on virtually *the same* factors from almost a year prior: macro-economic factors and increased selling prices.  But, GAAP and ASC 326 required that those same inflationary factors *would have* – and *should have* – already been factored into CarMax's loan loss predictions at least a year earlier.[10]

85.     Also, in 1Q26 CarMax increased its loan loss provision by an additional $33 million, telling investors on the 1Q26 earnings call that the loan loss provision was adequate and the provision was at the "high watermark."  Based on their prior statements Defendants were undoubtedly aware before 1Q26 of observable and unique default risk factors impacting the 2022 and 2023 loans that increased CarMax's loan loss provision.

86.     GAAP required Defendants to adjust the Company's model to reflect current conditions and *not* rely solely on past events to estimate expected credit losses.  Specifically, ASC 326 required CarMax to include a measure of the expected risk of credit loss when calculating its 1Q26 loan loss reserves, "*even if that risk is remote*, regardless of the method applied to estimate credit losses."[11]  Defendants knew, or disregarded with severe recklessness that the 2022 and 2023 "borrowers were coming back into delinquency . . . during Q1" and the more than remote risk that that those borrowers would continue to "revert back to delinquency and loss" as well as the unique nature of those loans.

---

[10]    Fed Funds interest rates rose from 1.75% in June 2022 to 5.5% in June 2023. The rate actually fell to 4.5% by May 2025 (1Q26).  Trading Economics, *United States Interest Rate*, https://tradingeconomics.com/united-states/interest-rate (last visited Mar. 27, 2026).

[11]    In addition, ASC 450 – Loss Contingencies (450-20-25-3) states, "The conditions [pertaining to the recognition of loss contingencies] are not intended to be so rigid that they require virtual certainty before a loss is accrued."  As such, GAAP did *not* permit CarMax to wait until 2Q26 for "virtual certainty" of increased loan losses on the 2022 and 2023 vintages to record a material increase in the provision.

87.     Specifically, Daniels admitted during the Company's 2Q26 conference call:

Look, *I think there's something incredibly unique about the 2022 to '23 consumer*, and it is an industry issue . . . .

So let's highlight the '22 and '23 vintages.  That customer, as I mentioned, high ASP, certainly a higher APR environment, higher overall payment they were seeing.  They come into the purchasing cycle with excess cash from COVID, and they hadn't fully experienced inflation yet.  So we had a lot to learn about that customer.  Initially, we saw some – again, we're coming off of incredibly low trough loss rates of '19, '20, '21 vintages, so hard to gauge how there's '22 and '23 vintages were going to perform.  We saw an increase in losses initially, but that's not surprising because it's coming off of trough lower vintages of those previous years.

So as we watched that customer perform, we saw it and thought maybe it was a pull forward in losses.  Ultimately, as we saw a little increase, so maybe a timing curve adjustment, and then we watch that customer begin to struggle and continue to struggle a little bit.  We made some adjustments that we thought were very smart for the consumer and smart for us, and that has proven to be the case.  And that was we adjusted our extension policy in the fall.  We saw more payments come in, had we otherwise not done that, so we were pleased to see that, but we had to watch that play through.

*We saw some of those customers coming back into delinquency and loss during Q1*.  It's obviously a tax time season as well so it's a little muddied. So we did make an adjustment in Q1.  And we wanted to watch it all play through.  We saw some good performance initially with, again, those extensions, we wanted to see how much was going to come back in delinquency.  *And unfortunately, during the quarter, we saw more revert back to delinquency and loss*.

88.     Even though Defendants made an adjustment to the provision in 1Q26, they failed to adequately consider the unique nature and the real risk of increased delinquency of those loans, known in 1Q26, in violation of GAAP.  In fact, Defendants possessed corroborating data demonstrating the increase in delinquencies during in 1Q26.  In 1Q26, CarMax's past due loans increased by 10%, from $853.9 million in 4Q25, to $939.7 million in 1Q26 and remained at that elevated level ($944.1 million) in 2Q26 as depicted in the chart below:

- 39 -



89.    Defendants misrepresented to investors that they were properly accounting for loan losses in accordance with GAAP and adequately estimating "losses expected [over] the remaining contractual life" of the loans while recording sufficient provisions for *lifetime* losses on those loans since the "time of origination."  Defendants also assured investors that they used a sophisticated model that took into account macro-economic factors and "vehicle price index . . . to predict changes in gross loss and recovery rates" and would factor in qualitative factors and make necessary adjustments based on those factors.

90.    Based on the above observable information, Defendants either knew or acted with severe recklessness in turning a blind eye to the continued losses on the 2022 and 2023 loan vintages in 1Q26.  Either way, Defendants simply did not make the required quantitative and

qualitative adjustments to historical loss information as required by GAAP which caused CarMax's loan loss provisions to be materially understated in 1Q26.

91.    As a result of ongoing and observable under-provisioning of loan loss increases in 1Q26, Defendants were forced to record a massive $142 million "true up" adjustment to its loan loss provision in 2Q26.



92.    In its 2Q26 presentation that accompanied its conference call, Defendants, for the first time, disclosed a chart of loss curves for their portfolio, including the 2022 and 2023 originated loans. The chart demonstrates a dramatic increase in cumulative net loss for Tier 1 loans since origination, based on conditions Defendants admitted they had been closely monitoring.



### 3.    Defendants' Under Provisioning was Material

93.    CarMax reported the following consolidated earnings and CAF income from 2Q25 to 2Q26.

| CarMax Earnings befor taxes and CAF Income | | | | | |
|---|---|---|---|---|---|
| Q2 2025 to Q2 2026 | | | | | |
| | Q2 2025 | Q3 2025 | Q4 2025 | Q1 2026 | Q2 2026 |
| CarMax Earnings before taxes | $  177.8 | $  166.5 | $  118.4 | $  281.3 | $  127.0 |
| CAF Income | $  115.6 | $  159.9 | $  158.5 | $  141.7 | $  102.6 |

94.    CarMax's material drop in income in 2Q26 was attributed to a "true up" adjustment for its loan loss provision. Defendants explained on the 2Q26 Earnings Call that "[t]he primary driver of the $71 million adjustment on the existing portfolio comes from additional losses anticipated within the 2022 and 2023 vintages." That "true up" adjustment represented 50% of the total provision adjustment for 2Q26. The provision for CarMax's *existing portfolio* (which includes the 2022 and 2023 vintages) almost doubled from $37.6 million in 1Q26 to $71 million in Q2 2026 – an increase of $33.7 million. CAF's 2Q26 income was materially impacted by the provision adjustment – falling 28% from $141.7 in 1Q26 to $102.6 in 2Q26, a drop of $39 million.

The "true up" adjustment also materially impacted CAF's income outlook for full year 2026 which went from an expected year-over-year increase to an expected "flat to down" year as of September 2025. CarMax attributed CAF's drop in income to the "larger provision impact this quarter." Had CarMax, been properly accounting for the credit losses on the 2022 and 2023 loans in accordance with GAAP, at least $33 million of the $71 million true up adjustment taken in 2Q26 would have been recorded no later than 1Q26. This under provisioning materially overstated CAF's 1Q26 income by at least 23% ($33 million divided by $141.7 million) and CarMax's 1Q26 consolidated earnings before taxes by at least 12% ($33 million divided by $283.1 million). Notably, during the 2Q26 earnings call, an analyst from J.P. Morgan was taken aback by the increase of the provisioning, stating, "I'm just surprised by just the magnitude of the provision pickup because we had your last earnings call just two months ago[.]"

## VI.   LOSS CAUSATION AND ECONOMIC LOSS

95.    During the Class Period, as alleged above in ¶¶19-94, Defendants engaged in a scheme to defraud and made materially untrue, false, and misleading statements and/or omitted material information concerning CarMax's financial performance, growth, and competitive strength. Defendants' fraudulent conduct had the effect of artificially inflating, maintaining, and manipulating the price of CarMax securities and deceived Lead Plaintiff and the Class, causing purchasers of CarMax securities to suffer economic harm as the truth reached the market. When the circumstances concealed by Defendants began to be revealed, it caused the price of CarMax securities to fall as the prior artificial inflation came out of the price. As a result of their purchase or acquisition of CarMax securities at inflated prices during the Class Period, and the decline in the price of CarMax securities when the relevant truth began to be revealed, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

The following paragraphs detail examples of instances, during the Class Period, in which the relevant truth was partially revealed.

96.    On September 25, 2025, CarMax shocked the market in its 2Q26 Release by revealing weaker than expected year-over-year 2Q26 financial results, reflecting sharp declines across multiple key performance metrics, including a 24.7% decline in diluted EPS to $0.64. During the conference call held that same day, Mayor-Mora directly attributed the 24.7% EPS decline to "lower volume and the CAF loss provision adjustment." Despite Defendants' previous assurances that CAF loan loss provisioning was at its "high watermark," CarMax surprised the market with news of a sharp increase of $142.2 million for the quarter in its provision for loan losses, resulting in CAF income decreasing by more than 11%. CarMax explained that its 2Q26 provision for loan losses "included an increase of $71.3 million in [its] estimate of lifetime losses on existing loans, primarily due to worsening performance among the 2022 and 2023 vintages." CarMax further elaborated on the increase, noting "[a]s of August 31, 2025, the allowance for loan losses of $507.3 million was 3.02% of auto loans held for investment, up from 2.76% as of May 31, 2025."

97.    Also during the call, Daniels disclosed that the Company "saw some of those ['22 and '23 vintage loan] customers coming back into delinquency and loss *during* Q1" and that despite "some good performance initially" "during the [second] quarter, we saw more revert back to delinquency and loss."

98.    The Company's 2Q26 Release also reported sharp declines in sales, revenues, and profits of its retail used car business, including a 7.2% decline in retail used vehicle revenues; a 5.4% decline in retail used unit sales; a 6.3% decline in comparable store used unit sales; 5.6% decline in total gross profit; a 4.2% decline in "other" gross profit; and a 7.6% decline in used

vehicle gross profit.  Nash on the conference call also reported that "retail gross profit per used unit" was "down approximately $200 [million] from the first quarter," and acknowledged that "[t]he sequential decline was more than twice our historical average," a sharp reversal from 1Q26 where he had highlighted an "all-time record" of retail GPU performance.

99.    Furthermore, contrary to his earlier representations denying demand was due to predominately macroeconomic factors and that CarMax was not "see[ing] any impact on [its] business" from consumer "financial[] stress[],'", Nash admitted that the "uptick" in sales in "March and April" was in fact driven by customer's anticipating increased vehicle pricing and "tariff speculation."

100.    Nash also explained that as a result of increasing inventory "[a]cross the back half of May through the end of June," the Company "saw about $1,000 in depreciation" per used retail unit in 2Q26, and that the "buying . . . up" of "inventory" from 1Q26, combined with this depreciation, were the "most impactful" in driving 2Q26 used unit sales declines.  He further revealed that the Company had to "lower[] retail margin to drive sell-through [of that oversupply in inventory]" and that it "intentionally slowed buys to balance our inventory with sales."  Nash further elaborated that the reported quarterly $200 million decline in retail GPU is attributable to "the actions" CarMax intentionally undertook.  As a result, Nash acknowledged that in 2Q26, "we fell into a spot where we weren't as competitive," and that CarMax's "price" and "sales" were negatively affected.

101.    On this news, the price of CarMax common stock plummeted $11.45 per share, or *20%*, from its closing price on September 24, 2025, to close at $45.60 per share on September 25, 2025, on abnormally high trading volume of more than 28 million shares.

102.    This news shocked the investing public, prompting direct reactions from analysts and investors.

(a)    During the 2Q26 conference call, an analyst from J.P. Morgan reacted: "I'm just surprised by just the magnitude of the provision pickup because we had your last earnings call just two months ago."

(b)    In a September 25, 2025 report, Stephens Inc. wrote that "[r]esults should be looked at as being disappointing regardless of how one looks at KMX," noting that 2Q26 EPS was "roughly 40% below estimates," and that total units sold, comparable store used unit sales, and CAF income also fell below estimates. The report also stated, the "worsening performance of 2022 and 2023 vintages" were "a bit shocking" and "[w]e believe investors will have trouble digesting them as well."

(c)    Truist concluded in a September 25, 2025 report that "2Q [was] a miss across the board," and further noted that "CAF income came in at $103mm, well below our forecast," driven by "much higher" loan-loss provisions due to "worsening performance among the '22/'23 vintages." Truist lowered its CY25/CY26 EPS estimate to $3.25 from $4.15, and its price target from $74 to $47.

(d)    A BNP Paribas report issued on September 25, 2025, noted that "[t]his was a poor quarter for CarMax" and that the "CAF business also rapidly deteriorated, confirming one of our concerns last quarter that a shift of loans into held for sale could be masking underlying credit deterioration."

(e)    J.P. Morgan in a September 25, 2025 report noted "[t]here is very little redeeming in results today." J.P. Morgan also remarked that "[t]he quarter was marked by weak SS retail unit comps, softer-than-expected retail GPUs, and underperformance in 'Other' gross

profit." The report noted that "tariff pull-forward into F1Q and intra-quarter depreciation" impacted "price competitiveness" and that "[t]he lack of pricing competitiveness did not translate into retail GPU upside, with GPU at $2,216 vs. JPMe $2,350."

(f) Another analyst from J.P. Morgan wrote in a September 26, 2025 report that the 2Q26 results "confirm investors' worst fears" and that there was "[l]imited [v]isibility on any [q]uick [f]ix."

(g) Analysts at Benchmark in an October 7, 2025 report highlighted the significance of the $1,000 depreciation per unit on CarMax's performance, noting that the $1,000 depreciation per unit "compressed two-thirds of annual depreciation into just six weeks" and that accordingly, "[t]he biggest quarterly drag came from catch-up depreciation" which was driven by the "tariff-driven pull-forward."

(h) In a September 25, 2025 report, RBC Capital Markets' reaction was mixed, stating, "[t]his was a tough quarter for KMX," noting a "sharp negative reversal in retail units." RBC Capital Markets added that retail net sales were driven by comp used vehicle unit sales of "-6.3% (cons. +2.2%)," which it described as "a material change in trend." Despite these changes, RBC Capital Markets' analyst still assigned an "Outperform" rating to CarMax.

103. Then on November 6, 2025, the truth was more fully revealed when CarMax issued its Form 8-K disclosing that Nash was "terminated" on November 4, 2025, and that, as a result, he resigned from the Board effective December 1, 2025.

104. On that same day, the Company also announced poor 3Q26 preliminary outlook "[b]ased on the latest financial results," including an 8%-12% decrease in comparable store used unit sales and "Net earnings per diluted share of $0.18-$0.36, including $0.09 of non-recurring expenses related primarily to the leadership change announced today and Customer Experience

- 47 -

Center workforce reductions." The Company further revealed that its 3Q26 financial results "have been impacted" by several factors, including "a decline in retail unit sales" demonstrating decreased demand.

105. On this news, the price of CarMax common stock fell another $9.93, or *over 24%* per share, from a closing price of $40.81 per share on November 5, 2025, to a closing price of $30.88 per share on November 6, 2025, on abnormally high trading volume of over 24 million shares.

106. Upon news of Nash's termination and weak 3Q26 preliminary outlook and financial results, analysts and investors were stunned:

(a) RBC Capital Markets in a November 6, 2025 report warned that the Company's "abrupt" CEO transition and preliminary third-quarter guidance "well below Street" expectations would likely cause investors to "tread with caution for the foreseeable future."

(b) BNP Paribas in a November 10, 2025 report, reiterated its Underperform rating and warned that CarMax was "at a crossroads after the recent departures of its long tenured CEO and [Chief Marketing Officer]."

(c) A November 6, 2025 Morgan Stanley report, noted that the Company's preliminary guidance for same-store sales of approximately "-10% y/y at the midpoint" was "materially weaker" than expectations and warned that "investors may remain pressured" as the market questions "whether Carmax can grow share at all with omni-channel."

(d) Analysts, such as Benchmark through a November 6, 2025 report, remarked that the "decline in retail volumes" was "worse than expected."

107. The decline in the price of CarMax securities after the corrective disclosures came to light was a direct result of the revelation of the nature and extent of Defendants' fraudulent

- 48 -

misrepresentations and omissions to investors and the market.  The timing and magnitude of the price declines in CarMax securities compared to the market and its peers negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The below chart demonstrates the clear divergence of the Company's common stock price from its benchmark indices and its identified competitors' stock prices ("Competitor Index")[12] as the revelation of the truth became known.  Notably, while CarMax's common stock price fell over 20% and 24% on September 25, 2025 and November 6, 2025, respectively, the S&P 500 and the S&P 500 Retailing Index declined a mere 0.5% and 1.78% on September 25, 2025, respectively, and 1.1%, and 2.97% on November 6, 2025, respectively:



---

[12]   CarMax identified the S&P 500 Index and the S&P 500 Retailing Index as benchmarks for its common stock performance in its FY25 Form 10-K.

108.    Accordingly, the economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' misrepresentations and omissions that artificially inflated the price of CarMax securities and the subsequent significant decline in the value of CarMax securities when Defendants' prior misrepresentations and omissions and other fraudulent conduct were revealed.

## VII.    PRESUMPTION OF RELIANCE

109.    A class-wide presumption of reliance is also appropriate with respect to the Exchange Act claims in this action under the fraud-on-the-market doctrine.  As a result of Defendants' materially false and misleading statements, the Company's publicly traded securities traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to CarMax, and have been damaged thereby.

110.    At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a)    As a regulated issuer, CarMax regularly made public filings with the SEC and related press releases;

(b)    CarMax regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(c)    CarMax was followed by several securities analysts employed by major brokerage firms, such as Truist, BNP Paribas, William Blair, J.P. Morgan, BofA Global Research,

Stephens Inc., Morgan Stanley, RBC Capital Markets, Oppenheimer, Barclays Capital Inc., and Wedbush Securities, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large. Each of these reports was publicly available and entered the public marketplace; and

(d)    Certain of the Company's securities, including its common stock, met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market.

111.    As a result of the foregoing, the market for the Company's securities promptly digested current information regarding CarMax from all publicly available sources and reflected such information in the prices of the Company's securities.

112.    Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices.

113.    At the times they purchased or otherwise acquired the Company's securities, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

114.    As a result of the above circumstances, the presumption of reliance applies.

115.    In sum, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations during the Class Period;

(b)    the misrepresentations were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## VIII.   NO SAFE HARBOR

116.    The 1Q26 Form 10-Q incorporated generic and boilerplate risk factors disclosed in the Company's FY25 Form 10-K.  The Company's supposed risk warnings, both individually and collectively, failed to warn the market of the true risks detailed herein.  These warnings were not meaningfully different from year-to-year, or quarter-to-quarter but, instead, were merely boilerplate language that failed to develop with time as the very risks they sought to warn of began to materialize.  Therefore, these "cautions" were untethered to the known problems at hand, rendering them meaningless.  Given the scope and magnitude of Defendants' fraud, as detailed herein, the risk warnings were themselves false and misleading and did not shield Defendants from liability.  The risk warnings were false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

117.    Moreover, to the extent that any statements pleaded herein are forward-looking, Defendants are liable for them because, at the time each of them was made, the particular speaker knew it was false or misleading, for the reasons detailed herein, and/or the forward-looking statement was authorized and/or approved by an executive officer of CarMax who knew it was false or misleading when made.

## IX.    CLASS ACTION ALLEGATIONS

118.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure alleging violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC, on behalf of all persons and entities who or which purchased or acquired publicly traded securities of CarMax during the Class Period, and who were damaged thereby ("Class").  Excluded from the Class are: (i) Defendants; (ii) present and former executive officers and directors of CarMax, and members of their immediate families (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing entities' and individuals' legal representatives, heirs, successors, or assigns; and (iv) any entity in which Defendants have or had a controlling interest, or any affiliate of any Defendant.  For avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by, or are under common control with one of the Defendants, and includes any employee benefit plan organized for the benefit of CarMax employees.

119.    Members of the Class are so numerous that joinder of all members is impracticable. According to the Company's SEC filings, as of February 28, 2025, CarMax had more than 153 million shares of common stock outstanding.  While the exact number of members of the Class can only be determined by appropriate discovery, Lead Plaintiff believes that members of the Class number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

120.    Lead Plaintiff's claims are typical of the claims of the members of the Class because Lead Plaintiff and all of the members of the Class sustained damages arising out of Defendants' wrongful conduct complained of herein.

121.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel experienced and competent in class actions and securities

litigation. Lead Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Lead Plaintiff seeks to represent.

122. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

123. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein in violation of the Exchange Act;

(e)    whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts in violation of the Exchange Act;

(f)       whether the market prices of the Company's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)       whether the members of the Class have sustained damages as a result of the decline in value of the Company's securities when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

124.    Lead Plaintiff repeats and re-alleges the allegations set forth in ¶¶1-123 above as though fully set forth herein.

125.    This claim is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5, on behalf of Lead Plaintiff and the Class, against each of the Defendants.

126.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, Lead Plaintiff, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's publicly traded securities; and (c) cause Lead Plaintiff and other members of the Class to purchase the Company's publicly traded securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

127.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as a controlling person of CarMax, as alleged below.

128. In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

129. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

130. Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's value, performance, and financial growth, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects

and omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

131. The Individual Defendants' primary liability and controlling person liability arise from the following facts, among others: (a) they were high-level executives at the Company during the Class Period; (b) the Individual Defendants, by virtue of their responsibilities and activities as executives were privy to, and participated in, the creation, development, and reporting of the Company's projections and financial condition; (c) they enjoyed significant personal contact and familiarity with, was advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) they were aware of the Company's dissemination of information to the investing public which they knew, or recklessly disregarded, was materially false and misleading.

132. Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severe reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with severe recklessness and for the purpose and effect of concealing information regarding the Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements and omissions throughout the Class Period regarding the Company's true financial

and operational results and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

133.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Company's securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with severe recklessness by, Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and other members of the Class acquired the Company's securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the securities price declines above.

134.   At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Lead Plaintiff and other members of the Class and the marketplace known of the Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their CarMax publicly traded securities during the Class Period; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

135.    By virtue of the foregoing, Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

136.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the securities price declines discussed above, when the artificial inflation was removed from the Company's securities.

137.    This claim is brought within the applicable statute of limitations.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against All Defendants

138.    Lead Plaintiff repeats and re-alleges the allegations set forth in ¶¶1-123 above as though fully set forth herein.

139.    This claim is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of Lead Plaintiff and the Class, against each of the Individual Defendants.

140.    The Individual Defendants acted as a controlling person of CarMax within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead

- 59 -

Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In addition, they had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same. CarMax controlled the Individual Defendants and the Company's other officers and employees.

142. As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their control, the Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the securities price declines discussed above, when the artificial inflation was released from the Company's securities.

143. This claim is brought within the applicable statute of limitations.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A. Declaring that this action is a proper class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and Lead Plaintiff as representative of the Class, and designating Lead Plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D.      Awarding rescission or a rescissionary measure of damages; and

E.      Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED:  March 31, 2026                         SILVERMAN THOMPSON SLUTKIN
                                                  & WHITE LLC
                                               STEVEN D. SILVERMAN (VSB No. 22887)
                                               ANDREW C. WHITE (VSB No. 08821)
                                               WILLIAM N. SINCLAIR (VSB No. 28833)


                                               *s/ William N. Sinclair*
                                               WILLIAM N. SINCLAIR

                                               400 E. Pratt Street, Suite 900
                                               Baltimore, MD  21201
                                               Telephone:  410/385-2225
                                               ssilverman@mdattorney.com
                                               awhite@mdattorney.com
                                               bsinclair@mdattorney.com

                                               Local Counsel

                                               ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
                                               DEBRA J. WYMAN (admitted *pro hac vice*)
                                               EVELYN SANCHEZ GONZALEZ
                                               (admitted *pro hac vice*)
                                               655 West Broadway, Suite 1900
                                               San Diego, CA  92101-8498
                                               Telephone:  619/231-1058
                                               debraw@rgrdlaw.com
                                               egonzalez@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
KATHLEEN B. DOUGLAS
(admitted *pro hac vice*)
BAILIE L. HEIKKINEN (admitted *pro hac vice*)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
kdouglas@rgrdlaw.com
bheikkinen@rgrdlaw.com

Lead Counsel for Lead Plaintiff

LABATON KELLER SUCHAROW LLP
ALFRED L. FATALE III
(admitted *pro hac vice*)
140 Broadway
New York, NY  10005
Telephone:  212/907-0884
afatale@labaton.com

LERNER LAW FIRM & ASSOCIATES
EVAN D. LERNER
400 Post Avenue, Suite 303
Westbury, NY 11590
Telephone:  516/307-1550
elerner@lernerlawfirm.com

Additional Counsel